Nos. 22-1266, 22-1289

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――――――――――――――

## NEW YORK PAVING, INC.

**Petitioner/Cross-Respondent**

v.

## NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

―――――――――――――――――

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

―――――――――――――――――

## BRIEF FOR THE NATIONAL LABOR RELATIONS BOARD

―――――――――――――――――

**ELIZABETH A. HEANEY**
*Supervisory Attorney*

**MICHAEL R. HICKSON**
*Senior Attorney*

**National Labor Relations Board**
**1015 Half Street, SE**
**Washington, DC 20570**
**(202) 273-1743**
**(202) 273-2985**

**JENNIFER A. ABRUZZO**
*General Counsel*
**PETER SUNG OHR**
*Deputy General Counsel*
**RUTH E. BURDICK**
*Deputy Associate General Counsel*
**DAVID HABENSTREIT**
*Assistant General Counsel*

**National Labor Relations Board**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| NEW YORK PAVING, INC. | ) | |
| Petitioner/Cross-Respondent | ) | Nos. 22-1266, 22-1289 |
| | ) | |
| v. | ) | Board Case No. 29-CA-254799 |
| | ) | |
| NATIONAL LABOR RELATIONS | ) | |
| BOARD | ) | |
| Respondent/Cross-Petitioner | ) | |

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A. Parties, Intervenors, Amici**

New York Paving, Inc. ("the Company") was the respondent before the Board and is the petitioner/cross-respondent before the Court. The Board is the respondent/cross-petitioner before the Court. Construction Council Local 175, Utility Workers Union of America, AFL-CIO ("Local 175") was the charging party before the Board. The Company, the Board's General Counsel, and Local 175 appeared before the Board in case number 29-CA-254799. There were no intervenors or amici before the Board, and there are none in this Court.

**B. Rulings Under Review**

This case involves the Company's petition to review and the Board's cross-application to enforce an Order the Board issued on September 26, 2022, reported at 371 NLRB No. 139.

## C. Related Cases

The ruling under review has not previously been before this Court or any other court.  Board Counsel are unaware of any related cases either pending or about to be presented before this or any other court.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570
(202) 273-2960

Dated at Washington, DC
this 15th day of May 2023

# TABLE OF CONTENTS

**Headings**                                                                                          **Page(s)**

Statement of jurisdiction .................................................................................1

Relevant statutory provisions ..........................................................................2

Statement of the issues ...................................................................................2

Statement of the case ......................................................................................2

I. The Board's findings of fact ....................................................................2

    A. The Company's operations and collective-bargaining relationships with Local 175 and Local 1010.............................................................2

    B. Local 1010 seeks to replace Local 175 as the asphalt pavers' representative; the Company unlawfully assists Local 1010 and unlawfully transfers work from Local 175 to Local 1010 ...................3

    C. Local 175 files a contractual grievance against the Company; an arbitrator issues a liability award sustaining the grievance .................5

    D. The parties discuss global settlement; the Company attempts to vacate the arbitrator's liability award and vows to do so again once a remedial award is issued ......................................................................6

    E. Global settlement talks continue; the parties hold a remedy hearing in the crew-size arbitration .............................................................8

    F. The Company's historical practice of limited winter layoffs; manager Zaremski's retirement and immediate replacement ...........................11

    G. Without giving Local 175 prior notice, the Company announces an unprecedented shutdown of asphalt-paving operations and widespread layoff of asphalt-unit employees, blaming Local 175 and its prosecution of the grievance; the Company lays off 35 of 50 asphalt pavers.................................................................................................12

    H. The Company belatedly offers to engage in effects bargaining and asserts shifting reasons for the mass layoff........................................14

II. Procedural history .................................................................................16

III. The Board's conclusions and order.........................................................16

i

## TABLE OF CONTENTS

**Headings** **Page(s)**

Summary of argument ................................................................17

Standard of review ...................................................................19

Argument ................................................................................19

I. Substantial evidence supports the Board's finding that the Company violated Section 8(a)(3) and (1) of the Act by laying off asphalt-unit employees in retaliation for Local 175's pursuit of a contractual grievance on their behalf ................................................................19

    A. Applicable principles ................................................................19

    B. The Company unlawfully laid off 35 asphalt-unit employees in retaliation for Local 175's pursuit of a contractual grievance ...........21

        1. Local 175's filing and prosecution of the crew-size grievance on behalf of unit employees constituted Section 7 activity; the Company's contrary claim is jurisdictionally barred and meritless ................................................................21

        2. Local 175's pursuit of the crew-size grievance was a motivating factor in the mass layoff ............................................25

        3. The Company's arguments do not undermine the Board's finding of unlawful motive ................................................32

        4. The Company failed to prove that it would have laid off the 35 employees absent its illicit motive ............................39

II. Substantial evidence supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by suspending asphalt-paving operations and laying off asphalt-unit employees without bargaining over the effects ................................................................45

    A. Applicable principles ................................................................45

    B. The Company breached its statutory bargaining obligation ..............47

        1. The Company had an effects-bargaining obligation, and its inadequate briefing has waived any contrary contention ...........47

ii

## TABLE OF CONTENTS

**Headings**                                                    **Page(s)**

2.   The Company failed to give Local 175 notice and an opportunity to bargain ........................................................................49

Conclusion ........................................................................................58

# Table of Authorities

**Cases**                                                                    **Page(s)**

*A.D. Conner, Inc.*,
   357 NLRB 1770 (2011) ................................................................ 45

*Ark Las Vegas Rest. Corp. v. NLRB*,
   334 F.3d 99 (D.C. Cir. 2003) ...................................................... 39

*Asher Candy, Inc. v. NLRB*,
   258 F. App'x 334 (D.C. Cir. 2007) ............................................ 50

*Bally's Park Place, Inc. v. NLRB*,
   646 F.3d 929 (D.C. Cir. 2011) .................................................. 19

*Brad Snodgrass, Inc.*,
   338 NLRB 917 (2003) .......................................................... 22, 24

*Cadillac of Naperville, Inc. v. NLRB*,
   14 F.4th 703 (D.C. Cir. 2021) .................................................. 33

*Cargill, Inc.*,
   294 NLRB 867 (1989) ............................................................ 46

*Cascades Containerboard Packaging*,
   370 NLRB No. 76 (2021) ........................................................ 56

*CC1 Ltd. Partnership v. NLRB*,
   898 F.3d 26 (D.C. Cir. 2018) ............................................... 21, 42

*Chevron Mining, Inc. v. NLRB*,
   684 F.3d 1318 (D.C. Cir. 2012) ....................................... 22, 24, 27

*Citizens Inv. Servs. Corp. v. NLRB*,
   430 F.3d 1195 (D.C. Cir. 2005) .............................................. 39

*Consol. Edison Co. of N.Y., Inc. v. FERC*,
   510 F.3d 333 (D.C. Cir. 2007) ............................................ 42, 48

*Contemporary Cars, Inc. v. NLRB*,
   814 F.3d 859 (7th Cir. 2016) ................................................ 47

*Enter. Leasing Co. v. NLRB*,
   831 F.3d 534 (D.C. Cir. 2016) .............................................. 23

iv

## Table of Authorities (cont'd)

**Cases** **Page(s)**

*Federated Logistics & Operations v. NLRB*,
  400 F.3d 920 (D.C. Cir. 2005) .......................................................... 34

*First Nat'l Maint. Corp. v. NLRB*,
  452 U.S. 666 (1981) ........................................................... 46, 47, 49

*Ford Motor Co. v. NLRB*,
  441 U.S. 488 (1979) ............................................................... 47

*Fort Dearborn Co. v. NLRB*,
  827 F.3d 1067 (D.C. Cir. 2016) ......................................................... 21

*Fountain Valley Reg'l Hosp.*,
  297 NLRB 549 (1990) ................................................................ 56

*Glades Elec. Coop., Inc.*,
  366 NLRB No. 112 (2018) ........................................................ 22, 27

*Harley-Davidson Motor Co.*,
  366 NLRB No. 121 (2018) .............................................................. 55

*HealthBridge Mgmt., LLC v. NLRB*,
  798 F.3d 1059 (D.C. Cir. 2015) ....................................................... 23

*Inova Health Sys. v. NLRB*,
  795 F.3d 68 (D.C. Cir. 2015) .......................................................... 19

*Int'l Ladies' Garment Workers Union v. NLRB*,
  463 F.2d 907 (D.C. Cir. 1972) ........................................... 49, 51, 53

*J. Huizinga Cartage Co. v. NLRB*,
  941 F.2d 616 (7th Cir. 1991) ...................................................... 44-45

*Jones v. Bernanke*,
  557 F.3d 670 (D.C. Cir 2009) ......................................................... 48

*Joseph Stallone Elec. Contractors, Inc.*,
  337 NLRB 1139 (2002) ................................................................ 27

## Table of Authorities (cont'd)

**Cases**                                                                **Page(s)**

*Kentucky Gen., Inc.*,
   334 NLRB 154 (2001) ............................................................ 28, 37

*Lapeer Foundry & Machine, Inc.*,
   289 NLRB 952 (1988) ................................................................. 47

*Laro Maint. Corp. v. NLRB*,
   56 F.3d 224 (D.C. Cir. 1995) ................................................... 21

*Metro. Edison Co. v. NLRB*,
   460 U.S. 693 (1983) ................................................................. 20

*Midwest Terminals of Toledo*,
   365 NLRB No. 159, *enforced*,
   783 F. App'x 1 (D.C. Cir. 2019) ...................................... 28, 34, 36

*Napleton 1050, Inc. v. NLRB*,
   976 F.3d 30 (D.C. Cir. 2020) ................................................ 21, 27

*New York Paving, Inc.*,
   2019 NLRB LEXIS 226, 2019 WL 1514220, (April 5, 2019), *adopted in*
   *absence of exceptions*,
   2019 NLRB LEXIS 300, 2019 WL 2208710 (May 20, 2019) ("*New York*
   *Paving 1*") .................................................. 3, 4, 28, 29, 30, 34, 36, 37

*New York Paving, Inc.*,
   370 NLRB No. 44 (2020), *enforced*,
   D.C. Cir. Nos. 20-1469, 21-1003 (Dec. 10, 2021)
   ("*New York Paving 2*") ...................................... 4, 5, 28, 30, 34, 35, 37

*New York Rehab. Care Mgmt., LLC v. NLRB*,
   506 F.3d 1070 (D.C. Cir. 2007) ............................................ 42, 48

*NLRB v. Advertisers Mfg. Co.*,
   823 F.2d 1086 (7th Cir. 1987) .................................................. 47

*NLRB v. City Disposal Sys., Inc.*,
   465 U.S. 822 (1984) ................................................................. 22

**Table of Authorities (cont'd)**

**Cases**                                                                                           **Page(s)**

*NLRB v. Emsing's Supermarket, Inc.*,
   872 F.2d 1279 (7th Cir. 1989) ................................................................. 56

*NLRB v. Gissel Packing Co.*,
   395 U.S. 575 (1969) .............................................................................. 33

*NLRB v. Ingredion Inc.*,
   930 F.3d 509 (D.C. Cir. 2019) .............................................................. 46

*NLRB v. Litton Fin. Printing*,
   893 F.2d 1128 (9th Cir. 1990) .......................................................... 46, 48

*NLRB v. Seaport Printing & Ad Specialties, Inc.*,
   589 F.3d 812 (5th Cir. 2009) ................................................................ 53

*NLRB v. Transportation Management Corporation*
   462 U.S. 393 (1983) .......................................................................... 20, 21

*Nova Se. Univ. v. NLRB*,
   807 F.3d 308 (D.C. Cir. 2015) .......................................................... 23, 32

*Novato Healthcare Ctr. v. NLRB*,
   916 F.3d 1095 (D.C. Cir. 2019) ............................................................ 32

*Ozburn-Hessey Logistics, LLC v. NLRB*,
   833 F.3d 210 (2016) ................................................................... 20, 21, 25

*Pan Am. Grain Co.*,
   343 NLRB 318 (2004), *enforcement denied in part on other grounds*,
   432 F.3d 69 (1st Cir. 2005) .................................................................. 52

*Parsippany Hotel Mgmt. Co. v. NLRB*,
   99 F.3d 413 (D.C. Cir. 1996) ........................................................... 28, 34

*Penntech Papers v. NLRB*,
   706 F.2d 18 (1st Cir. 1983) .................................................................. 52

*Pontiac Osteopathic Hosp.*,
   336 NLRB 1021 (2001) .................................................................. 55, 56

## Table of Authorities (cont'd)

**Cases**                                                                              **Page(s)**

*Porta-King Bldg. Sys. v. NLRB,*
    14 F.3d 1258 (8th Cir. 1994) ............................................................ 57

*Power Inc. v. NLRB,*
    40 F.3d 409 (D.C. Cir. 1994) ........................................................... 20

*Progressive Elec., Inc. v. NLRB,*
    453 F.3d 538 (2006) ........................................................................ 28

*Prop. Res. Corp. v. NLRB,*
    863 F.2d 964 (D.C. Cir. 1988) ........................................... 31, 40, 44, 45

*Pub. Serv. Co. v. NLRB,*
    843 F.3d 999 (D.C. Cir. 2016) .......................................................... 47

*RAV Truck & Trailer Repairs v. NLRB,*
    997 F.3d 314 (D.C. Cir. 2021) .......................................................... 39

*Sierra Int'l. Trucks Inc.,*
    319 NLRB 948 (1995) ................................................................ 50, 52

*Sw. Merch. Corp. v. NLRB,*
    53 F.3d 1334 (D.C. Cir. 1995) ..................................................... 21, 31

*Teamsters Local Union No. 171 v. NLRB,*
    863 F.2d 946 (D.C. Cir. 1988) ............................................ 46, 48, 50, 51

*United States v. Jones,*
    744 F.3d 1362 (2014) ...................................................................... 48

*Valley Slurry Seal Co.,*
    343 NLRB 233 (2004) ..................................................................... 45

*Vico Prods. Co. v. NLRB,*
    333 F.3d 198 (D.C. Cir. 2003) ................................................ 46, 49, 57

*Vincent Indus. Plastics, Inc. v. NLRB,*
    209 F.3d 727 (D.C. Cir. 2000) ............................................... 21, 28, 34

*W.F. Bolin Co. v. NLRB,*
    70 F.3d 863 (6th Cir. 1995) ............................................................. 44

## Table of Authorities (cont'd)

**Cases**                                                                    **Page(s)**

*Wendt Corp. v. NLRB,*
   26 F.4th 1002 (D.C. Cir. 2022) .................................................. 21, 28

*Willamette Tug & Barge Co.,*
   300 NLRB 282 (1990) ...................................................... 50, 51

*Woelke & Romero Framing, Inc. v. NLRB,*
   456 U.S. 645 (1982) ........................................................... 23

*Wright Line,*
   251 NLRB 1083 (1980), *enforced on other grounds,*
   662 F.2d 889 (1st Cir. 1981) ...................................... 20, 39


**Statutes**                                                                 **Page(s)**

National Labor Relations Act, as amended
  (29 U.S.C. § 151 et seq.)


Section 7 (29 U.S.C. § 157) ...............................................................19
Section 8(a)(1) (29 U.S.C. § 158(a)(1)).............. 2, 16, 17, 18, 19, 20, 33, 34, 45, 46
Section 8(a)(3) (29 U.S.C. § 158(a)(3))................................. 2, 16, 17, 19, 20, 34
Section 8(a)(5) (29 U.S.C. § 158(a)(5))........................... 2, 16, 18, 34, 45, 46, 51
Section 8(c) (29 U.S.C. § 158(c)) ............................................................ 32, 33
Section 8(d) (29 U.S.C. § 158(d))............................................................ 46
Section 10(a) (29 U.S.C. § 160(a)) ..................................................... 1, 2
Section 10(e) (29 U.S.C. § 160(e)) ...................................... 2, 19, 23, 24, 32, 34
Section 10(f) (29 U.S.C. § 160(f)) .......................................................... 2


**Other**                                                                    **Page(s)**

Representation-Case Procedures: Election Bars; Proof of Majority Support in
  Construction Industry Collective-Bargaining Relationship, 87 Fed. Reg. 66890
   (proposed Nov. 4, 2022)............................................................. 4

# GLOSSARY

| | |
|---|---|
| 7/3 crews | Asphalt-paving crews utilizing 7 asphalt-unit employees on each top crew and 3 asphalt-unit employees on each binder crew |
| A. | Deferred joint appendix |
| Act | National Labor Relations Act |
| Br. | Company's opening proof brief |
| Company | New York Paving, Inc. |
| Liability Award | April 2019 arbitration award issued by Arbitrator Jay Nadelbach sustaining Local 175's grievance |
| Local 175 | Construction Council Local 175, Utility Workers Union of America, AFL-CIO |
| Local 1010 | District Council of Pavers and Builders, LIUNA, AFL-CIO |
| New York Paving 1 | *New York Paving, Inc.*, 2019 NLRB LEXIS 226, 2019 WL 1514220, (April 5, 2019), *adopted in absence of exceptions*, 2019 NLRB LEXIS 300, 2019 WL 2208710 (May 20, 2019) |
| New York Paving 2 | *New York Paving, Inc.*, 370 NLRB No. 44 (2020), *enforced*, D.C. Cir. Nos. 20-1469, 21-1003 (Dec. 10, 2021) |
| Union | Construction Council Local 175, Utility Workers Union of America, AFL-CIO |

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

### Nos. 22-1266, 22-1289

———————————————

### NEW YORK PAVING, INC.

**Petitioner/Cross-Respondent**

**v.**

### NATIONAL LABOR RELATIONS BOARD

**Respondent/Cross-Petitioner**

———————————————

## ON PETITION FOR REVIEW AND CROSS-APPLICATION FOR
## ENFORCEMENT OF AN ORDER OF
## THE NATIONAL LABOR RELATIONS BOARD

———————————————

## BRIEF FOR
## THE NATIONAL LABOR RELATIONS BOARD

———————————————

## STATEMENT OF JURISDICTION

New York Paving, Inc. ("the Company") petitions for review of, and the

National Labor Relations Board cross-applies to enforce, a Board Order (371

NLRB No. 139) issued on September 26, 2022.  (A. 98-141.)[1]  The Board had

jurisdiction under Section 10(a) of the National Labor Relations Act (29 U.S.C. §

———————————————

[1] References preceding a semicolon are to the Board's decision; those following
are to the supporting evidence.

160(a)) ("the Act"). The Company's petition and the Board's cross-application were timely; the Act imposes no time limits for such filings. The Court has jurisdiction over the Board's final Order pursuant to Section 10(e) and (f) of the Act (29 U.S.C. § 160(e) and (f)).

## RELEVANT STATUTORY PROVISIONS

Relevant statutory provisions are reproduced in the Addendum to this brief.

## STATEMENT OF THE ISSUES

1.    Does substantial evidence support the Board's finding that the Company violated Section 8(a)(3) and (1) of the Act by laying off asphalt-unit employees in retaliation for Local 175's pursuit of a contractual grievance on their behalf?

2.    Does substantial evidence support the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by suspending asphalt-paving operations and laying off asphalt-unit employees without giving Local 175 notice and an opportunity to bargain over the effects of its decision to do so?

## STATEMENT OF THE CASE

## I. THE BOARD'S FINDINGS OF FACT

### A. The Company's Operations and Collective-Bargaining Relationships with Local 175 and Local 1010

The Company performs asphalt and concrete paving in New York City; it repairs damage to streets and sidewalks caused by underground utility work. Peter

2

Miceli is the Company's director of operations. Bob Coletti is its general counsel. (A. 98, 111; A. 161-62, 483-84, 588-89, 607.)

The Company has a longstanding collective-bargaining relationship with Construction Council Local 175, Utility Workers Union of America, AFL-CIO ("Local 175" or "the Union"), which represents its asphalt-paving employees. The Company and Local 175 were bound to a collective-bargaining agreement through June 30, 2018. (A. 98, 111-12; A.186-88, 589, 607-08, 727) Since that time, they have engaged in unsuccessful negotiations for a successor agreement. (A. 98, 112; A. 186-88, 239-41.)

Other unions represent distinct units of the Company's employees. As relevant here, Local 1010, District Council of Pavers and Builders, LIUNA, AFL-CIO ("Local 1010") has long represented the Company's concrete pavers. (A. 98, 111; A. 177, 475-76, 484.)

## B. Local 1010 Seeks to Replace Local 175 as the Asphalt Pavers' Representative; the Company Unlawfully Assists Local 1010 and Unlawfully Transfers Work from Local 175 to Local 1010

In April 2017, Local 1010 undertook efforts to supplant Local 175 as the asphalt pavers' collective-bargaining representative. The Company, in assisting those efforts, committed multiple unfair labor practices. (A. 98, 112.) *See New York Paving, Inc.*, 2019 NLRB LEXIS 226, 2019 WL 1514220, (April 5, 2019), *adopted in absence of exceptions*, 2019 NLRB LEXIS 300, 2019 WL 2208710

3

(May 20, 2019) ("*New York Paving 1*").  Specifically, the Company unlawfully

urged asphalt pavers to support Local 1010's organizing efforts, and it unlawfully

threatened them with job loss if they did not sign cards authorizing Local 1010 as

their representative.  (A. 98, 112, 126.)  *Id.*, 2019 NLRB LEXIS 226 at *60-*68,

*95.  In late April 2017, Local 175 filed unfair-labor-practice charges challenging

these unlawful Company actions.  Around the same time, Local 1010 filed a

petition seeking a representation election in the asphalt-paving unit.  The Board's

regional director, acting pursuant to the agency's then-extant "blocking-charge"

policy, held the petition in abeyance pending investigation and processing of Local

175's charges.[2]  (A. 98, 112, 126; A. 822.)  *Id.*, 2019 NLRB LEXIS 226 at *2-*4,

*30.  Local 1010's representation petition remained pending into 2020.  (A. 118,

126; A. 283-84, 822-23.)

In 2018, the Company committed further violations of the Act that benefited

Local 1010 and harmed Local 175.  (A. 98-99, 112, 114.)  *See New York Paving,*

*Inc.*, 370 NLRB No. 44 (2020), *enforced*, D.C. Cir. Nos. 20-1469, 21-1003 (Dec.

10, 2021) ("*New York Paving 2*").  In particular, the Company unilaterally and

---

[2] Under that policy, the Board's regional directors had authority to delay
processing election petitions in the face of pending unfair-labor-practice charges
alleging conduct that would interfere with employee free choice in an election.
*See, e.g.*, Representation-Case Procedures: Election Bars; Proof of Majority
Support in Construction Industry Collective-Bargaining Relationship, 87 Fed. Reg.
66890, 66890-94 (proposed Nov. 4, 2022).

unlawfully transferred three distinct categories of work from Local 175 to Local 1010—first in January 2018, then in summer 2018, and again in fall 2018.  (A. 98-99, 112.)  *Id.*, slip op. at 1-4.  Local 175 again filed charges alleging these violations.  The Company continued to assign such unlawfully transferred work to Local 1010 throughout 2019 and into 2020.  (A. 98, 102 n.12, 112, 115, 126; A. 204, 258, 551-53, 564-66, 834.)

### C. Local 175 Files a Contractual Grievance Against the Company; an Arbitrator Issues a Liability Award Sustaining the Grievance

The Company dispatches its asphalt pavers on "binder crews," which fill holes with rough asphalt as a base or temporary surface, and "top crews," which pour finer asphalt on top of the filled holes to create a finished surface.  (A. 99 & n.5, 112; A. 188-90, 485-86.)  The parties' collective-bargaining agreement mandated that the Company use 7 employees on each top crew and 3 employees on each binder crew ("7/3 crews").  (A. 99, 112-13; A. 188-90, 237-38, 690, 704, 724-38.)  It is undisputed that, as of 2018, the Company was not complying with this contractual requirement.  Rather, for approximately 15-20 years, the Company had used 4-person top crews and 2-person binder crews.  (A. 99, 113; A. 485-86, 724-38.)  In March 2018, Local 175 filed a grievance on behalf of asphalt-unit employees alleging that the Company was violating the contractual crew-size requirements.  (A. 99, 112-13; A. 188-90, 722-23.)

5

In early 2019, the parties arbitrated the crew-size grievance at a hearing before Arbitrator Jay Nadelbach. In April 2019, Arbitrator Nadelbach issued an award ("Liability Award") rejecting the Company's past-practice defense and sustaining Local 175's grievance. The arbitrator directed the parties to discuss an appropriate remedy and damages and to return for further disposition if they were unable to reach agreement. (A. 99, 113; A. 195, 724-38.)

### D. The Parties Discuss Global Settlement; the Company Attempts to Vacate the Arbitrator's Liability Award and Vows to Do So Again Once a Remedial Award is Issued

In June 2019, the parties met and discussed a potential global resolution of their various ongoing disputes. They were represented at this meeting by their attorneys—Matthew Rocco and Eric Chaikin for Local 175, and Jonathan Farrell and Ana Getiashvili for the Company. (A. 111, 113-14; A. 185-97, 231-33, 338-40, 341-42.) During the meeting, Farrell and Getiashvili stated that the Company would seek to vacate the Liability Award. No global settlement was reached. (A. 113-114, 134; A. 196-98, 231-34, 979.)

The following month, the Company filed a petition in district court to vacate the Liability Award. In late August, the parties submitted a stipulation withdrawing the petition without prejudice, agreeing that the Liability Award was not final, and stipulating that a future petition to vacate filed after the issuance of a final arbitration award would not be time-barred. (A. 114; A. 198-200, 739-49,

750-51.)  In preparing the stipulation, the Company's attorneys told Rocco that they would, in fact, petition again to vacate the Liability Award once Arbitrator Nadelbach issued a remedial award.  (A. 114, 134; A. 198-200, 255-56.)  The arbitrator later scheduled a remedy hearing for October 25, 2019.  (A. 114; A. 255-56, 980-87.)

Although the parties did not meet between June and October 25, they continued to informally discuss a potential successor contract and other ongoing disputes.  (A. 114 & n.23; A. 341-42.)  Amid these discussions, on August 13, Farrell texted Rocco concerning Local 1010's pending petition for an election to represent the asphalt-paving bargaining unit—which continued to be held in abeyance pursuant to the Board's blocking-charge policy.  (A. 114-15, 124-25; A. 465-70, 822-23, 877.)  The Board had recently issued proposed rules modifying that policy.  In his text messages, Farrell referenced the proposed rules and commented that "[b]locking charges are gone."  (A. 114, 124-25; A. 877.)  "That election is coming," Farrell added, opining that Local 1010 would surely request that the election proceed under the new rules.  Farrell suggested that the contemplated rule changes and their implications for Local 1010's petition might "shake [Local 175's] complacency" and spur it to reach a resolution with the Company.  (A. 114-15, 124-25; A. 877)

**E. Global Settlement Talks Continue; the Parties Hold a Remedy Hearing in the Crew-Size Arbitration**

On October 25, the parties met prior to the remedy hearing in the crew-size arbitration and continued their global-settlement discussions. (A. 115; A. 202-05.) At the time, their outstanding disputes included, in addition to the arbitration: the overall negotiation of a successor collective-bargaining agreement; the Company's continued assignment of unlawfully transferred work to Local 1010; the Company's allegedly improper failure to implement a wage increase; and a pending class-action lawsuit alleging that the Company improperly compensated asphalt pavers for their travel time. (A. 113 & n.8, 114-15, 135; A. 163-64 , 174-75, 190-94, 200-05, 319-21, 322-23, 676-89.)

During these discussions, Farrell stated that the Company was willing to return some of the unlawfully transferred work to Local 175 as part of a global settlement. (A. 102 n.12, 115, 126; A. 204.) Rocco, meanwhile, noted Local 175's ongoing concern with Local 1010's efforts to take over representation of the asphalt unit. Rocco expressed Local 175's interest in finalizing a successor contract, which he believed would preclude a spring 2020 open period during which Local 1010 could file a new representation petition or proceed with its pending petition. (A. 115; A. 204, 822-23.) In response, Farrell acknowledged that there "very well could be an open period" and Local 1010 "very well could file a petition." He then asserted that the 7/3 crew size required by the Liability

8

Award was "unworkable" and would result in "a lot of . . . Local 175 employees out of work." Farrell added that the Company would "make [the employees] aware," so they would "know to blame Local 175 for being out of work." (A. 115, 133-34; A. 204-05, 213, 464.)

Rocco eventually suggested that the parties engage a mediator to assist them at a later date in reaching a global resolution. Farrell agreed. (A. 115, 135; A. 205-07.) The parties then commenced the hearing, informing Arbitrator Nadelbach that they were "still discussing global matters," and asking that he "reserve any decision" until they had completed their attempts to "resolve all [such] matters." (A. 115, 135; A. 205-07, 752-53.) Local 175 presented its calculations of damages allegedly caused by the Company's failure to use 7/3 crews—including unit employees' lost wages and benefit contributions. (A. 99, 115; A. 202-03, 753-58, 807-09, 1002-08.) The Company, for its part, argued that "even if the [Liability Award] stands" (A. 757), it would owe no damages. (A. 115; A. 757, 759-60, 806, 809-10.)

Miceli testified at length during this arbitration hearing. He did not say that the Company would implement the 7/3 crew size. He did, however, offer tentative predictions about the potential impact if the Company were to do so. (A. 115-16, 133; A. 760-75.) For example, Miceli asserted that, "if" the Company "possibly" implemented 7/3 crews, it was "contemplating" that it would need to lay off unit

9

employees.  (A. 115-16, 133; A. 768, 773.)  At certain points in his testimony, he claimed there was a "100 percent" chance that 7/3 crews would result in such layoffs.  (A. 99, 116; A. 767, 774.)  However, Miceli also repeatedly qualified such predictions, stating that "we don't even know how" the Company would operate with 7/3 crews, and, "obviously[,] we need to go back inhouse, [and] think about [it]," because "we've only been brainstorming this for a little while," and "we've only discussed it maybe two or three times."  (A. 115-16 & n.32, 133; A. 766-67, 774.)  Additionally, although Miceli outlined a possible "bundling" system that the Company might use to effectuate the larger crew size—holding work orders until they could be performed together in a geographic area—he also noted that "maybe we can come up with [an alternative system] as we keep going forward."  (A. 99, 115-16, 133; A. 774-75.)

Later that day, the parties spoke with Mediator Elliott Shriftman concerning potential dates for their contemplated mediation in pursuit of a global settlement. On October 30, however, Rocco informed the mediator and Farrell that Local 175 was not available on the date Shriftman had tentatively reserved.  (A. 115 & n.25, 116, 135; A. 205-08, 244-45, 362-69, 775, 988, 1020, 1021-25.)

Over the following weeks, the parties continued to informally discuss a comprehensive settlement of their disputes.  (A. 99, 116-17; A. 252.)  The contemplated mediation, however, was never scheduled.  Ultimately, Local 175

10

decided not to pursue the mediation because it did not believe that the Company was serious about reaching a global settlement, and it was concerned that further delaying relief in the crew-size arbitration would harm asphalt-unit employees and damage Local 175's standing in their eyes—thereby hurting the Union's position if Local 1010 renewed its bid for a representation election.  (A. 116-17, 138-39; A. 207-08, 252.)  In December, Rocco requested that Arbitrator Nadelbach proceed with issuing a remedial award.  That award did not issue until June 2020.  (A. 117, 121; A. 207-08, 213-15, 252, 806-13, 980-87.)

### F.  The Company's Historical Practice of Limited Winter Layoffs; Manager Zaremski's Retirement and Immediate Replacement

The Company had a longstanding annual practice of instituting limited, temporary layoffs of asphalt pavers each winter, in part because cold weather and winter precipitation make asphalt paving more difficult.  (A. 99, 117; A. 266-67, 271-73, 303-04, 402, 517-19.)  From December to January of 2016-2017, 2017-2018, and 2018-2019, the Company temporarily laid off between 5 and 8 asphalt-unit employees.  (A. 100, 117; A. 614-16, 621-23.)  It never laid off asphalt foremen, who were members of the Local 175 bargaining unit, as part of these seasonal layoffs.  Instead, the Company consistently offered all available winter work to foremen first, with the result that it sometimes dispatched asphalt crews composed entirely of foremen.  (A. 100, 101 n.9, 117, 121, 127; A. 266-70, 276-80, 305-07, 424, 428-30, 507.)

As of 2019, Robert Zaremski was the Company's operations manager.  He had primary responsibility for overseeing the Company's asphalt-paving work, including formulating route and crew assignments.  (A. 111; A. 396-98, 261-62, 413-15, 523.)  Patrick Figarole had served as Zaremski's assistant for 24 years.  For years, Figarole had scheduled and assigned employees to asphalt paving and milling crews and had served as operations manager in Zaremski's absence.  (A. 102-03, 130; A. 177-82, 261-62, 274-75, 280-82, 292-98, 426.)  Several years prior to 2019, the Company determined that Figarole would succeed Zaremski as operations manager whenever he retired.  Around late 2017, Zaremski began openly considering retirement.  (A. 130; A. 71-73, 177-78, 538-40, 550.)

In early December 2019, Zaremski informed the Company that he would retire effective December 20.  (A. 111 & n.4, 130; A. 403-09, 418-20, 427, 1035-36, 1040-42.)  Pursuant to the Company's longstanding plan, Figarole assumed the position of operations manager immediately upon Zaremski's December 20 retirement.  (A. 118, 130; A. 165, 173.)

### G. Without Giving Local 175 Prior Notice, the Company Announces an Unprecedented Shutdown of Asphalt-Paving Operations and Widespread Layoff of Asphalt-Unit Employees, Blaming Local 175 and Its Prosecution of the Grievance; the Company Lays Off 35 of 50 Asphalt Pavers

On December 20, 2019, the Company conducted a group meeting with the foremen and supervisors of Local 175 and Local 1010.  Miceli informed the group

12

of Zaremski's retirement.  Coletti then announced that because of the Liability

Award in the arbitration, the Company would bundle work orders and perform

them in clusters, rather than continuing to complete the orders as they came in.  He

further asserted, without explanation, that this bundling would result in temporary

and permanent layoffs and the demotion of some foremen.  (A. 99, 117; A. 262-64,

280.)

On the same day, the Company distributed a lengthy written notice to all

asphalt-unit employees, including by enclosing a copy of it with their paychecks.

(A. 99-100, 117-18; A. 166-68, 180-81, 424-25, 531, 613.)  The notice announced

that the Company "has decided to shutdown asphalt operations and *lay off nearly*

*all asphalt paving workers* until March 2020 and possibly longer."  (A. 99; A. 613)

(emphasis in original).  It expressly identified Local 175's successful prosecution

of the crew-size grievance in arbitration as the primary reason for the shutdown

and layoff.  (A. 99-102, 126; A. 613.)  The notice identified Zaremski's December

20 retirement as the secondary, and only additional, reason.  There was no mention

of a seasonal slowdown or winter weather.  (A. 99-100, 102 & n.14, 126, 128; A.

613.)

Although the Company knew that Figarole would immediately replace

Zaremski as operations manager, the notice claimed that Zaremski's retirement left

the Company "lack[ing] a supervisor to run the asphalt paving division."  (A. 99,

13

130; A. 613.)  The notice also asserted that Local 175 was "trying to hurt [the asphalt pavers'] jobs" and suggested that. the Union "did not care" that "its own members" would be laid off.  (A. 99-100, 126; A. 613.)

The Company suspended asphalt-paving operations and began laying off asphalt-unit employees on the same day as its foremen's meeting and written notice—December 20, 2019.  (A. 132-33 & n.60; A. 259-261, 265-66, 531-32, 547, 613, 624-30, 795, 825, 830, 839.)  Prior to that date, the Company had never told Local 175 that it intended to take such actions, nor that it would implement the 7/3 crew size or the Liability Award.  (A. 124, 133-35; A. 196-98, 213, 231-33, 253-56, 257, 462-63, 535-38.)

By January 2020, the Company had laid off 35 of 50 asphalt-unit employees, including some foremen.  (A. 100, 118, 127; A. 259-61, 307-13, 532-34, 624-36.)  The Company eventually recalled a few of these laid-off workers in February 2020, and more the following month.  Others, however, remained laid off into April 2020 and beyond—including two foremen whom the Company permanently laid off.  (A. 127, 128 n.54, 132, 134 n.61; A. 259-61, 508, 542-43, 544-45, 634-75.)

### H. The Company Belatedly Offers to Engage in Effects Bargaining and Asserts Shifting Reasons for the Mass Layoff

In the first days of January 2020, the Company fully implemented the 7/3 crew size and began dispatching 3-person binder crews.  (A. 100, 118, 122, 129; A.

516, 520, 530-31, 553-54.)  On January 30, more than 3 weeks later—and almost 6 weeks after the Company's December 20 shutdown and layoff actions—the Company sent Local 175 a letter offering to bargain "regarding the effects of [the Company's] implementation" of the Liability Award.  (A. 102, 119; A. 208-10, 794.)  This letter also was sent after the Company had received notice of Local 175's unfair-labor-practice charge alleging the Company's failure to bargain concerning the December 20 actions.  (A. 102 & n.14, 118-19 & n.34; A. 455-61, 575-83, 843-45.)

In contrast to its December 20 notice, the Company's January 30 letter eschewed identifying the crew-size grievance or Liability Award as having motivated the December 20 layoff.  (A. 102 & n.14, 119, 128; A. 794-98.)  Instead, the letter asserted only two reasons for the mass layoff:  the seasonal winter slowdown and Zaremski's retirement.  (A. 119, 128; A. 795.)  Similarly, on February 18, the Company submitted a position statement to the Board's regional office claiming that the layoff was "unrelated to" the Liability Award and was instead attributable to "the usual 'slow down' in business associated with the winter months," which was "compounded" by Zaremski's retirement.  (A. 100, 102 & n.14, 128; A. 825-26, 830-31, 835-36.)

## II. PROCEDURAL HISTORY

Local 175 filed charges and, following an investigation, the Board's General Counsel issued a complaint, alleging that the Company: violated Section 8(a)(3) and (1) of the Act by laying off 35 unit employees because Local 175 pursued the crew-size grievance on their behalf; and violated Section 8(a)(5) and (1) of the Act by suspending asphalt-paving operations and laying off unit employees without affording Local 175 notice and an opportunity to bargain over the effects of its decision to do so. Following a hearing, the administrative law judge found that the Company violated the Act as alleged.

## III. THE BOARD'S CONCLUSIONS AND ORDER

The Board (Members Wilcox and Prouty, Member Ring dissenting in part) issued its Decision and Order concluding that the Company violated the Act as found by the judge.[3] The Board's Order directs the Company to cease and desist from those violations, and from, in any like or related manner, interfering with employees' exercise of their rights under the Act. Affirmatively, the Order requires the Company, among other things, to offer the 35 laid-off unit employees full reinstatement; make them whole; bargain on request with Local 175 regarding the effects of its decision to suspend asphalt-paving operations and lay off unit employees; and post a remedial notice.

---

[3] Member Ring dissented only regarding the Section 8(a)(3) violation.

## SUMMARY OF ARGUMENT

Substantial evidence supports the Board's finding that the Company violated Section 8(a)(3) and (1) of the Act by laying off 35 asphalt-unit employees. The Board reasonably determined that Local 175's protected pursuit of a contractual grievance on the unit employees' behalf was a motivating factor in the Company's mass-layoff action. Indeed, the Company's written layoff notice makes plain its intent to retaliate against Local 175's members because of these known grievance activities. The notice unequivocally identified the Union's protected conduct as the principal reason for the mass layoff, repeatedly blaming Local 175 and its prosecution of the grievance for the Company's sweeping adverse action. Further, the Company's notice asserted that Local 175 had callously, even deliberately, put its own members out of work—a naked attempt to denigrate, and thereby further undermine, its representation of the bargaining unit. The Board also correctly determined that the Company's prior violations in *New York Paving 1* and *New York Paving 2* collectively reveal a pattern of similar unlawful efforts to weaken employee support for Local 175 and strongly reinforce the unlawful-motive finding here. And the Company's blatantly shifting justifications for the mass layoff provide yet further compelling support for that finding.

The Board also reasonably determined that the Company failed to prove its affirmative defense that it would have laid off the 35 employees even absent Local

175's protected grievance activities on their behalf.  While the Company asserted three reasons for the mass layoff, the record—including the Company's shifting claims concerning these purported reasons and its utter failure to substantiate them—shows the proffered justifications to be mere pretext.

Substantial evidence likewise supports the Board's finding that the Company violated Section 8(a)(5) and (1) of the Act by failing to bargain with Local 175 over the effects of its decision to suspend asphalt-paving operations and lay off most asphalt-unit employees.  Given this decision's unquestionable impact on the asphalt pavers' terms and conditions of employment, the Company clearly had an obligation to engage in such effects bargaining.  Just as plainly, however, the Company failed to do so because it did not give Local 175 notice of the decision until the day of its implementation.  Under settled law, the Company therefore contravened its bargaining duties in violation of the Act.

The Company has presented no basis to disturb the Board's amply supported Order.  Many of its contentions are jurisdictionally barred from consideration because the Company failed to raise them before the Board or are waived because it failed to adequately brief them before the Court.  And all the Company's contentions lack either precedential or evidentiary support.

## STANDARD OF REVIEW

This Court's review of Board decisions is "narrow and highly deferential." *Inova Health Sys. v. NLRB*, 795 F.3d 68, 73 (D.C. Cir. 2015). The Board's unfair-labor-practice findings will be upheld unless they have no rational basis or are unsupported by substantial evidence on the record as a whole. *Bally's Park Place, Inc. v. NLRB*, 646 F.3d 929, 935, 938-39 (D.C. Cir. 2011); *see also* 29 U.S.C. § 160(e). The Court will not reverse the Board for lack of substantial evidence unless it determines that the record is "so compelling that no reasonable factfinder could fail to find to the contrary." *Inova*, 795 F.3d at 80.

## ARGUMENT

I. **SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(3) AND (1) OF THE ACT BY LAYING OFF ASPHALT-UNIT EMPLOYEES IN RETALIATION FOR LOCAL 175's PURSUIT OF A CONTRACTUAL GRIEVANCE ON THEIR BEHALF**

### A. Applicable Principles

Section 7 of the Act guarantees to employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157. Section 8(a)(3) of the Act protects those rights by making it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure

19

of employment or any term or condition of employment to . . . discourage

membership in any labor organization." 29 U.S.C. § 158(a)(3).[4]  Thus, an

employer violates Section 8(a)(3) "by taking an adverse employment action . . . in

order to discourage union activity." *Ozburn-Hessey Logistics, LLC v. NLRB*, 833

F.3d 210, 217 (2016) (quotation marks omitted); *accord Power Inc. v. NLRB*, 40

F.3d 409, 417 (D.C. Cir. 1994) (layoffs "based on anti-union animus" violate

8(a)(3)).

In assessing whether an employer has taken an adverse action because of

Section 7 activity, the Board applies the test to determine motivation set forth in

*Wright Line*, 251 NLRB 1083 (1980), *enforced on other grounds*, 662 F.2d 889

(1st Cir. 1981), and approved by the Supreme Court in *NLRB v. Transportation

Management Corporation*, 462 U.S. 393 (1983).  Consistent with that test, if

substantial evidence supports the Board's finding that protected activity was "a

motivating factor" in the employer's adverse action, a court must uphold the

finding that the action was unlawful unless the record as a whole compelled the

Board to accept the employer's affirmative defense that it would have taken the

---

[4] A violation of Section 8(a)(3) produces a derivative violation of Section 8(a)(1) of the Act, which makes it an unfair labor practice to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [Section 7 of the Act]." 29 U.S.C. § 158(a)(1).  *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983).

same action in the absence of protected conduct. *Transp. Mgmt.*, 462 U.S. at 400-05; *accord Fort Dearborn Co. v. NLRB*, 827 F.3d 1067, 1072 (D.C. Cir. 2016).

An employer's unlawful motivation can be inferred from circumstantial or direct evidence. *Laro Maint. Corp. v. NLRB*, 56 F.3d 224, 229 (D.C. Cir. 1995). Evidence of unlawful motive may include the employer's knowledge of protected activity, *Ozburn-Hessey*, 833 F.3d at 218, hostility toward protected conduct, *Wendt Corp. v. NLRB*, 26 F.4th 1002, 1010-11 (D.C. Cir. 2022), statements expressly linking such conduct to an adverse action, *Napleton 1050, Inc. v. NLRB*, 976 F.3d 30, 44, 47 (D.C. Cir. 2020), commission of other unfair labor practices, *Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 735-36 (D.C. Cir. 2000), and shifting justifications for its actions, *Sw. Merch. Corp. v. NLRB*, 53 F.3d 1334, 1344 (D.C. Cir. 1995). Determining an employer's motive "invokes the expertise of the Board," *Laro*, 56 F.3d at 229, and this Court is "especially deferential" to such Board findings. *CC1 Ltd. Partnership v. NLRB*, 898 F.3d 26, 32 (D.C. Cir. 2018) (quotation marks omitted).

**B. The Company Unlawfully Laid Off 35 Asphalt-Unit Employees in Retaliation for Local 175's Pursuit of a Contractual Grievance**

**1. Local 175's filing and prosecution of the crew-size grievance on behalf of unit employees constituted Section 7 activity; the Company's contrary claim is jurisdictionally barred and meritless**

"The invocation of a right rooted in a collective-bargaining agreement is unquestionably an integral part of the process that gave rise to the agreement."

21

*NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 831 (1984).  Accordingly, the "filing" or "processing" of a contractual grievance to enforce a collectively bargained right constitutes protected, concerted activity under Section 7 of the Act. *Id.* at 829-32, 836-37, 840.  Such conduct lies within Section 7's protective ambit whether it is carried out by one or more employees directly, *id.*, or by a union acting on behalf of employees it represents.  *Glades Elec. Coop., Inc.*, 366 NLRB No. 112, slip op. at 14-15, 16 & n.45, 2018 NLRB LEXIS 236, at *70-*71, *79-*81 & n.45 (2018); *Brad Snodgrass, Inc.*, 338 NLRB 917, 917 & n.1, 923 & n.14, 925 (2003).

In view of these principles, the Board here properly concluded that Local 175 engaged in Section 7 activity by "filing . . . the crew size grievance" and "prosecut[ing] . . . [it] through arbitration."  A. 101 & n.7, 125-26.)  As the Board found, the Union plainly undertook these activities to enforce collectively bargained rights "on behalf of its member employees."  (A. 101 & n.7.)  Thus, Local 175's pursuit of the grievance constituted protected, concerted conduct.  (A. 101 & n.7, 125.)  *See Glades*, 366 NLRB No. 112, slip op. at 14-15, 16 & n.45; *Brad Snodgrass*, 338 NLRB at 917 & n.1, 923 & n.14, 925; *see also Chevron Mining, Inc. v. NLRB*, 684 F.3d 1318, 1321-22, 1326 (D.C. Cir. 2012) (union engaged in Section 7 activity by exercising collectively bargained right to call work stoppages to pressure employer concerning contractual grievances).

22

Before the Court, the Company—parroting a view expressed by dissenting Board Member Ring—briefly asserts (Br. 35-36) that Local 175's grievance activities were not protected by the Act because the record does not show whether unit employees were aware of such activities or supported them. The Court, however, lacks jurisdiction to consider this assertion because the Company never raised it before the Board.

Section 10(e) of the Act provides in relevant part: "No objection that has not been urged before the Board . . . shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 160(e). Courts thus "lack[] jurisdiction to review objections that were not urged before the Board." *Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 665-66 (1982); *accord Nova Se. Univ. v. NLRB*, 807 F.3d 308, 313, 316 (D.C. Cir. 2015). Moreover, a party "may not rely on arguments raised in a [Board member's] dissent or on a discussion of the relevant issues by the majority to overcome the [Section]10(e) bar; the Act requires the party to raise its challenges itself." *Enter. Leasing Co. v. NLRB*, 831 F.3d 534, 550-51 (D.C. Cir. 2016) (quotation marks omitted); *accord HealthBridge Mgmt., LLC v. NLRB*, 798 F.3d 1059, 1069 (D.C. Cir. 2015).

Here, as the Board explicitly noted (A. 101 & n.7), the Company failed to except to the administrative law judge's clear finding that Local 175's pursuit of

the crew-size grievance "constitutes activity protected under the Act." (A. 125.) (*See* A. 87-97, Exceptions Brief.)[5] And before the Court, the Company does not claim, much less show, extraordinary circumstances that would excuse its failure. The Court, therefore, does not have jurisdiction to entertain the Company's belated assertion. 29 U.S.C. § 160(e).

In any event, the assertion is meritless. As the Board explained, Local 175's contractual-grievance activities on behalf of the unit employees whom it represents were protected by Section 7 irrespective of whether the employees supported or knew of those activities. (A. 101 n.7.) *Brad Snodgrass*, 338 NLRB at 923 (union agent's grievance activities protected although employees "may not have been aware" of them and "may not have directly participated"); *cf. Chevron*, 684 F.3d at 1326 (rejecting as "curious and myopic" suggestion that, "although employees are free to join unions and to work through unions for purposes of 'other mutual aid or protection,' the conduct of the unions they form and join for those purposes is not protected by the Act") (quotation marks omitted).

---

[5] The Company's Exceptions Brief is not part of the administrative record. The Board therefore filed, simultaneously with its proof brief, a motion to lodge the Exceptions Brief with the Court.

## 2.  Local 175's pursuit of the crew-size grievance was a motivating factor in the mass layoff

Substantial evidence supports the Board's finding (A. 98, 100-02, 125-28) that Local 175's protected filing and prosecution of the crew-size grievance was a motivating factor in the Company's layoff of the 35 asphalt-unit employees. Indeed, "direct evidence" as well as "ample circumstantial evidence" strongly demonstrate that the Company acted "in retaliation for Local 175's contractual grievance."  (A. 98, 100, 128.)

To begin, it is undisputed (A. 101, 125) that the Company was well aware of Local 175's pursuit of the grievance.  When the Company commenced laying off asphalt-unit employees on December 20, it knew that Local 175 continued its ongoing prosecution of the grievance in the pending arbitration.  *See Ozburn-Hessey*, 833 F.3d at 218 (knowledge of protected conduct is relevant factor in assessing motive).

Moreover, the Board reasonably found (A. 98, 101, 125-26) that the Company's December 20 notice to asphalt-unit employees constitutes "direct evidence" of its unlawful motive.  (A. 98, 101.)  That notice announced the Company's "shutdown [of] asphalt operations" and widespread, potentially permanent layoff of "*nearly all asphalt paving workers*."  (A. 99-101, 125-26.)  As the Board recognized, the notice expressly identified Local 175's prosecution of

25

the crew-size grievance as the Company's main reason for taking these drastic actions.  (A. 98, 101, 125-26.)

Indeed, in "three separate portions" of the December 20 notice, the Company "blamed Local 175's grievance" for the shutdown and layoff.  (A. 101.) First, the notice expressed that the Company was taking these actions because "Local 175 filed many grievances and arbitrations" and "obtained a decision" in "one of those arbitrations" (the Liability Award) that "forced [the Company] to make *major changes*" to its operations and crew assignments.  (A. 99-101, 125-26.)  Second, the notice asserted that some if not all the laid-off asphalt pavers would remain laid off "[u]ntil the arbitration decision is reversed" and predicted that, "if and when we restart asphalt paving operations," the Company would "employ fewer . . . asphalt paving workers than we currently employ" because of "the changes Local 175 has forced on us" through the crew-size grievance.  (A. 99-101, 125-26.)  Third, the notice professed the Company's purported regret for the layoff, which it again blamed on "Local 175's *deliberate efforts* to interfere with our industry-standard asphalt paving operations."  (A. 99-101, 125-26.)

As the Board reasonably determined, these statements "leave no doubt that the [Company] undertook the layoff in retaliation for Local 175's lawful pursuit of a grievance to enforce language in the collective-bargaining agreement."  (A. 101.) Thus, "[a]lthough it is unusual for an employer to directly acknowledge taking

adverse action because of protected activity, [the Company] did so here."
*Chevron*, 684 F.3d at 1328; *see also Napleton*, 976 F.3d at 44, 47 (employer
statements expressly linking adverse actions to protected activity amounted to
"virtual admissions" of unlawful motive); *Glades*, 366 NLRB No. 112, slip op. at
14-16; *Joseph Stallone Elec. Contractors, Inc.*, 337 NLRB 1139, 1139 (2002).

Furthermore, as the Board additionally noted (A. 126), the Company's
December 20 notice denigrated Local 175 and its representation of asphalt-unit
employees by telling those employees that Local 175 "did not care" they would be
laid off and was, in fact, "trying to hurt your jobs." (A. 100, 126.) Viewing these
statements—along with the accusations blaming Local 175 for the layoff—in light
of Local 1010's pending representation petition and overall efforts to replace Local
175, the Board reasonably concluded that the notice reflected the Company's intent
to "undermine Local 175 in the estimation of its members in the event that Local
1010" renewed its representation challenge during a spring 2020 open period. (A.
126.) Indeed, Farrell had previously conveyed that the Company may follow
"precisely [this] course." (A. 126.) He stated, in the context of discussing Local
1010's potential upcoming renewal of its representation campaign, that
implementing the Liability Award would result in "a lot of [asphalt pavers] out of
work" and the Company would "make them aware," so the employees would
"know to blame Local 175." (A. 115, 126, 133-34.) Accordingly, as the Board

found (A. 126), the Company's layoff notice evinces "open hostility" toward Local 175 and its protected grievance activities as well as an illicit desire to kneecap the Union in a potential representation election against rival union Local 1010. *Wendt*, 26 F.4th at 1010-11; *see also Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 541-42, 549-50 & n.12 (2006).

Substantial evidence also supports the Board's finding that the Company's "history of established violations of the Act" in *New York Paving 1* and *New York Paving 2* further demonstrates its discriminatory motive here. (A. 102, 126-27.) (See pp. 3-5.) *See Vincent*, 209 F.3d at 735-36 (employer's other unfair labor practices showed unlawful motive); *Parsippany Hotel Mgmt. Co. v. NLRB*, 99 F.3d 413, 423-24 (D.C. Cir. 1996) (same); *Midwest Terminals of Toledo*, 365 NLRB No. 159, slip op. at 1 n.1, 16 (Dec. 15, 2017) (prior-case violations supported unlawful-motive finding), *enforced*, 783 F. App'x 1 (D.C. Cir. 2019); *Kentucky Gen., Inc.*, 334 NLRB 154, 156-60 (2001) (same). Indeed, as the Board determined (A. 102 & n.12, 126-27), the nature of those prior violations powerfully spotlights the animus behind the Company's mass-layoff action.

More specifically, the Company's unfair labor practices in *New York Paving 1* involved its unlawful assistance of rival union Local 1010 in its efforts to supplant Local 175 and unlawful threats to discharge Local 175 members if they did not support Local 1010's efforts. And *New York Paving 2* involved the

28

Company's unlawful transfer of three categories of work from Local 175 to Local 1010. (A. 98-99, 102, 112, 114, 126-27.) (See pp. 3-5.) Collectively, these violations show the Company's "history of animus toward the employees' support of Local 175." (A. 102.)

Moreover, the Company's prior violations are connected to the critical events in this case. (A. 102 & n.12, 126-27.) Local 1010's representation petition filed in *New York Paving 1* remained pending through the time of the Company's December 2019 layoff. (A. 126-27.) And Farrell "repeatedly raised the specter of Local 1010's designs on the Local 175 bargaining unit in connection with" the crew-size grievance and arbitration. (A. 126.) Farrell's ominous warnings were evident in his August 2019 text message exhorting Local 175 that "[Local 1010's] election is coming," and in his October 2019 statements that "Local 1010 very well could file a petition" and the Company would make sure asphalt pavers "know to blame Local 175" for any layoffs that could ensue from the Liability Award. (A. 126.) Thus, Local 1010's "overall effort to represent the asphalt workers in the Local 175 bargaining unit"—which the Company unlawfully assisted in *New York Paving 1*—"loomed large over the sequence of events at issue here." (A. 126.) And Farrell's "far-fetched attempts to deny during his testimony that he was aware of Local 175's trepidations in this regard merely accentuate the issue's importance." (A. 126-27.)

29

Likewise, the Company continued assigning to Local 1010, through the time of the December 2019 layoff, the work that it had unlawfully transferred from Local 175 in *New York Paving 2*. (A. 102, 126.)  And the Company, in October 2019 and March 2020, "repeatedly held out" the potential return of that unlawfully transferred work as a bargaining chip in an overall "deal" that would include Local 175 abandoning the crew-size grievance. (A. 102 & n.12, 115, 120, 126; A. 204, 258, 564-66, 1053-66.)  Further, as the Board also noted (A. 102), the Company's owners and top managers in *New York Paving 1* and *New York Paving 2* remained the same in the instant case.

Accordingly, the Board reasonably inferred that the December 2019 mass layoff was the Company's latest offensive in its "years-long unlawful campaign to rid itself of Local 175." (A. 102.)  The Company's prior-case violations establish "a pattern of [its] attempts to weaken the [Local 175] bargaining unit" by "actively organizing for a rival union" and "assigning unit work to employees outside the unit." (A. 102.)  Here, the Company continued that pattern when it "again tried to weaken support of Local 175 by laying off employees and blaming the Union." (A. 102.)

Finally, substantial evidence likewise supports the Board's finding that the Company's "shifting justifications for the mass layoff" provide "additional compelling evidence" of unlawful motive. (A. 102 & n.14, 128.)  As the Board

30

explained (A. 102, 128), the Company's December 20 notice attributed the layoff to precisely "two reasons:" Zaremski's retirement and, "*more importantly*," implementation of the Liability Award. (A. 613.) The notice contained "no mention" of a seasonal slowdown. (A. 102, 128.) Over a month later, however, the Company conspicuously changed its tune. (A. 102, 128.)

Specifically, in its January 30 letter to Local 175 and February 18 position statement to the Board's regional office, the Company suddenly "attempt[ed] to portray" the mass layoff as a "typical seasonal layoff[]" caused by "the usual [winter slowdown]," albeit as "compounded" by Zaremski's retirement. (A. 102 & n.14, 128.) Thus, the Company injected a new justification for the mass layoff even as it disclaimed the justification it had previously asserted as most important—"eschewing mention of the [Liability Award] as grounds for the layoff[]." (A. 102 & n.14.) Indeed, the Company's position statement repeatedly insisted that the December 2019 layoff was "unrelated to" the Liability Award. (A. 102, 128; A. 831, 835-36.) As the Board reasoned, the Company's "inability to settle" on a consistent explanation for its adverse action "bolsters the . . . finding of [unlawful] animus." (A. 102.) *Sw. Merch.*, 53 F.3d at 1344; *Prop. Res. Corp. v. NLRB*, 863 F.2d 964, 967 (D.C. Cir. 1988).

31

### 3. The Company's arguments do not undermine the Board's finding of unlawful motive

The Company fails to muster a successful challenge to the Board's unlawful-motive determination. Some of its arguments are jurisdictionally barred and all are meritless.

In challenging the Board's finding that the December 20 notice shows unlawful motivation, the Company contends only that the notice is protected by Section 8(c) of the Act. (Br. 37-40.) *See* 29 U.S.C. § 158(c). The Court, however, cannot consider this contention because the Company did not urge it before the Board. 29 U.S.C. § 160(e). (See p. 23.) The Company filed only the barest of exceptions to the judge's finding (A. 125-26) that the December 20 notice evinces unlawful motive—asserting, without explanation, its objection to it. (*See* A. 95.) Further, the Company's exceptions brief provides no hint of "the specific grounds for [this] objection[]," *Nova*, 807 F.3d at 313, 316, and neither document mentions Section 8(c). Thus, the Company's wholly "generalized" exception does not save its belated Section 8(c) argument from Section 10(e)'s jurisdictional bar. *Id.*; *see also Novato Healthcare Ctr. v. NLRB*, 916 F.3d 1095, 1107 (D.C. Cir. 2019) (Section 8(c) arguments not urged before Board are barred from judicial consideration). Nor does the majority and dissenting Board members' discussion of the issue. (See p. 23.)

In any event, the argument is meritless.  Consistent with Section 8(a)(1)'s prohibition on coercive speech, Section 8(c) provides that an employer may state its views, argument, or opinion about protected activity, but only if its statements do not contain an express or implied "threat of reprisal or force or promise of benefit."  29 U.S.C. § 158(c).  *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617-20 (1969).  Thus, Section 8(c) "does not give employers *carte blanche* to make threats against [protected] activity under the guise of innocent prognostication."  *Cadillac of Naperville, Inc. v. NLRB*, 14 F.4th 703, 716 (D.C. Cir. 2021).  Instead, to qualify as a permissible prediction of such activity's economic effects rather than a prohibited threat, an employer's comments "must be 'carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences[,]' and those consequences must be ones that are 'beyond [the employer's] control[.]'"  *Id.* (quoting *Gissel*, 395 U.S. at 618).

Here, the Board reasonably determined that the Company's shutdown notice contained statements constituting "threats to lay off employees in response to" Local 175's protected grievance activities and, therefore, was not shielded by Section 8(c).  (A. 101.)  As the Board explained, the December 20 notice presaged the "potentially permanent layoff[]" of asphalt-unit employees based on the crew-size changes "forced" by Local 175's grievance.  (A. 101.)  But "[i]n the absence of an explanation, based on objective fact, of how [such] staffing changes would

lead to the need for permanent layoffs," such layoffs remained "solely within the [Company's] control."  (A. 101.)  The Company's statements thus "crossed the line" from mere predictions to "threats of reprisal."  (A. 101.)  *See Federated Logistics & Operations v. NLRB*, 400 F.3d 920, 923-25 (D.C. Cir. 2005).

Equally unavailing are the Company's several attacks (Br. 41-45) on the Board's findings regarding its violations in *New York Paving 1* and *New York Paving 2*.  The Company first offers three broad challenges that are jurisdictionally barred.  It argues:  (1) that its prior violations are irrelevant because they did not involve Section 8(a)(3) of the Act; (2) that the judge's dismissal of an individual-discharge 8(a)(3) allegation in *New York Paving 2* undercuts the unlawful-motive finding here; and (3) that its prior violations are immaterial because they were not directed at protected activity substantially similar to Local 175's pursuit of the crew-size grievance.  (Br. 41-42.)  The Company presented none of these arguments to the Board, so the Court cannot entertain them.  29 U.S.C. § 160(e).  (See p. 23.)

In any event, the arguments lack merit.  First, it is settled that Section 8(a)(1) and Section 8(a)(5) violations may support an inference of unlawful motive.  *See Vincent*, 209 F.3d at 733-36; *Parsippany*, 99 F.3d at 423-24; *Midwest Terminals*, 365 NLRB No. 159, slip op. at 1 n.1, *enforced*, 783 F. App'x 1.  Second, the judge's dismissal of the individual-discharge allegation in *New York Paving 2* does

not negate that the Company's *established* violations in that case support the discriminatory-motive determination here.  Moreover, the *New York Paving 2* judge recommended dismissal of that allegation because the Company proved that it would have terminated the individual regardless of its unlawful motive, as he was "simply incapable" of adequately performing the job.  370 NLRB No. 44, slip op. at 19-20.  Accordingly, the dismissal has no bearing on the Company's unlawful motive in this case.[6]  Third, the Board acknowledged (A. 102) that the protected activity here is not the same as in the prior-case violations, but it reasonably concluded that those violations "nevertheless show a pattern of the [Company's] attempts to weaken the [Local 175] bargaining unit," which the Company continued here.  (A. 102.)  (See pp. 28-30.)  Further, the Company cites no authority to support the suggestion that the Board is categorically foreclosed from relying on prior-case violations unless they were directed at activity similar to the case at hand.

The Company also broadly suggests that its prior-case violations did not warrant an "automatic" finding of unlawful motive here and are "insufficient without more" to sustain the Board's motive determination.  (Br. 41-42.)  But as

---

[6] Contrary to the Company's suggestion (Br. 41), the Board in *New York Paving 2* did not pass on any aspect of the judge's individual-discharge analysis because no exceptions were filed to her dismissal recommendation.  *See* 370 NLRB No. 44, slip op. at 1 & n.3.

explained (pp. 28-30), the Board's reliance on the prior-case violations was not automatic, but rather, the Board considered their nature and circumstances as well as their similarities and connections to this case. And apart from the prior-case violations, the Board also relied on ample additional evidence to find the Company's unlawful motive.

The Company also makes several arguments focused on the Board's consideration of its *New York Paving 1* violations. (Br. 42-45.) For example, it asserts that those violations are too "remote in time" and "unrelated to the facts" to be relevant in this case. (Br. 42.) But this assertion ignores the Board's analysis and findings (A. 102, 126-27) showing that the Company's prior unlawful assistance and threats in support of Local 1010's representation efforts were "plainly" and "directly" pertinent here. (A. 102, 127 n.51.) (See pp. 28-30.)

Given the substantial factual connections between the *New York Paving 1* violations and the instant case, as well as the enduring identity of the Company's owners and top managers (A. 102), the absence of evidence that the agents who committed those prior violations were involved in the mass-layoff decision—noted by the Company (Br. 43)—is immaterial. Moreover, the Board has relied on prior-case violations that have occurred at temporal distances comparable or greater than that involved here. *See Midwest Terminals*, 365 NLRB No. 159, slip op. at 1 n.1, 16 (relying on prior-case violations, some of which occurred 32 months earlier or 5

years earlier); *Kentucky Gen.*, 334 NLRB at 156-60 (relying on prior-case

violations occurring more than 3 years earlier).  Furthermore, the Company

disregards that the Board also assessed the *New York Paving 1* violations in light of

the *New York Paving 2* violations and the overall history and pattern revealed by

the two cases considered together.

The Company additionally claims that its *New York Paving 1* violations are

irrelevant because the record here does not show whether Local 1010 was engaged

in activities to organize asphalt-unit employees at the time of the December 2019

layoff.  (Br. 43-44.)  The absence of such evidence, however, is beside the point.

As explained, at the time that it effectuated the mass layoff, the Company

understood that Local 1010:  maintained its ongoing interest (as embodied in its

pending representation petition) in replacing Local 175 as the asphalt pavers'

representative; could renew its organizing activities at any time (if it had not

already done so); and may very well be motivated to do so soon, given the

upcoming open period in spring 2020.  For the same reasons, it is irrelevant, rather

than "telling" (Br. 44), that Local 1010 later withdrew its pending petition and did

not ultimately file a new one.  The Company did not know that the future would

unfold in this manner.

Additionally, the Company widely misses the mark in claiming that certain

facts indicate its layoff action was not intended to "eliminate the discriminatees'

37

eligibility from voting" in a potential spring 2020 representation election featuring Local 1010 and Local 175.  (Br. 44-45.)  The Board found that the Company was motivated to "weaken [employee] support of Local 175" and "undermine Local 175 in the estimation of its members," in part to *discourage* employees from voting for Local 175 in such an election—not that the Company intended to make them *ineligible* to vote.  (A. 102, 126.)  And, contrary to the Company's further unsupported claim (Br. 45), the mere fact that it engaged in some bargaining with Local 175 concerning a successor contract does not establish that it intended to obviate the open period for an election.  Nor does it otherwise negate the ample evidence demonstrating its unlawful motive.

Finally, the Company attacks the Board's shifting-justification analysis as a purported "mischaracteriz[ation]" of the facts.  (Br. 45-46.)  According to the Company, it "always" and "consistently" maintained that the December 2019 layoff was necessitated by "all 3" of the following reasons:  (1) a seasonal slowdown; (2) Zaremski's retirement; and (3) "eventual implementation" of the 7/3 crew size.  (Br. 45-46.)  This fanciful assertion is inescapably refuted by the documentary evidence.  (See pp. 30-31.)  Additionally, the Board did not base its retaliatory-motive finding on the Company's shifting justifications "alone."  (Br. 46-47 (quotation marks omitted).)

**4. The Company failed to prove that it would have laid off the 35 employees absent its illicit motive**

Substantial evidence also supports the Board's finding (A. 100, 101 n.9, 102-03, 127-31) that the Company did not meet its *Wright Line* affirmative defense (pp. 20-21) of proving that it "would have taken the same action"—that is, "would have laid off nearly the entire bargaining unit"—even absent Local 175's protected grievance activities on unit employees' behalf (A. 100, 103). Before the Board, the Company asserted three reasons for the mass layoff—the seasonal winter slowdown, the retirement of Zaremski, and the implementation of the Liability Award requiring changes in its operations. (A. 102, 128.) To begin, however, the Board properly found (A. 102 n.14, 128-30) that the Company's inconsistent and shifting reliance on these purported reasons (pp. 30-31) indicates that they were "merely pretextual excuses," thereby undermining its affirmative defense. *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1202-03 (D.C. Cir. 2005); *accord Ark Las Vegas Rest. Corp. v. NLRB*, 334 F.3d 99, 105 (D.C. Cir. 2003).

Moreover, as the Board additionally found (A. 101 n.9, 102-03, 127-31), the Company utterly "failed to substantiate" its three proffered justifications (A. 129). Indeed, "even a cursory investigation" into each of them "reveals their pretextual nature," as shown below. (A. 102.) *See RAV Truck & Trailer Repairs v. NLRB*, 997 F.3d 314, 325-27 (D.C. Cir. 2021) (affirmative defense "fails as a matter of law" if proffered justifications are pretextual) (quotation marks omitted); *Prop.*

39

*Res.*, 863 F.2d at 967-68 (unsubstantiated claims insufficient to meet affirmative defense).

First, the Company failed to show that the seasonal winter slowdown in work necessitated its mass-layoff action consistent with its past practice. (A. 101 n.9, 103 & n.15, 127-28, 130.) To the contrary, the record establishes that the Company drastically departed from its seasonal-layoff practice in several respects.

In each of the three preceding winters, the Company had laid off only 5 to 8 asphalt-unit employees due to the seasonal slowdown—temporarily reducing its asphalt-paving workforce by between 9 and 14 percent. In stark contrast, here, the Company laid off 35 of 50 such employees—a 70 percent reduction. (A. 103, 127-28, 130.) (See pp. 11, 14.) Moreover, in prior winters, the Company "distributed the work more broadly," thereby avoiding largescale layoffs, whereas here, "without explanation," it disproportionately concentrated the work among comparatively fewer employees. (A. 103, 127-28.) For example, the ratio of total asphalt-paving work hours to number of retained asphalt-unit employees was more than 50 percent greater in January and February 2020 than it was in January 2018. (A. 127-28.)[7]

---

[7] Compare January 2020 (2,274 hours distributed among 18 employees = 126.33 hours/employee) and February 2020 (2,733 hours distributed among 21 employees = 130.14 hours/employee) with January 2018 (3,421.5 hours distributed among 42 employees = 81.46 hours/employee). (A. 127-28; A. 617-21, 631-36.) For this

Furthermore, the Company's 2019-2020 mass layoff included the wholly "unprecedented" layoff of asphalt-unit foremen.  (A. 100, 101 n.9, 103 n.15, 127.) And the Company's attempts at trial to explain this "marked deviation" from longstanding practice were "neither convincing nor substantiated."  (A. 127.) Additionally, the Company engaged in further unprecedented conduct by: announcing the layoff via a foremen's meeting and written notice; advising unit employees that the layoff may be permanent; and, in fact, permanently laying off at least two such employees.  (A. 99-100, 101 n.9, 103, 117-18, 127, 134 n.61; A. 168-70, 264-70, 300-04.)

Thus, as the Board concluded, the Company's numerous and significant deviations from its past practice "with respect to the size, scope, and permanency of the layoff[]" doom the winter slowdown as a basis for its affirmative defense. (A. 103, 127.)  And further undercutting that purported basis, the winter weather of 2019-2020 was "far milder than prior years"—with warmer temperatures and comparable or less precipitation.  (A. 100, 103, 130; A. 285-86, 289-91, 802, 814-21, 831.)

Before the Court, it is unclear whether the Company has affirmatively abandoned its seasonal-slowdown justification as a basis for contending that it met

---

reason, it is irrelevant that, as the Company's observes (Br. 36 n.4), the percentage decrease in total asphalt-paving work hours was slightly smaller from December 2019 to January 2020 than it was from December 2017 to January 2018.

41

its *Wright Line* defense.  (Compare Br. 36 n.4, 46 with Br. 48-51.)  In any event,

with one possible minor exception (Br. 36 n.4, discussed at n.7, *supra*), the

Company's opening brief fails to articulate—let alone adequately develop or

support—any specific challenge to the Board's well-reasoned analysis rejecting

that justification.  Accordingly, any such challenge is waived.  *See Consol. Edison*

*Co. of N.Y., Inc. v. FERC*, 510 F.3d 333, 340 (D.C. Cir. 2007) (arguments made in

merely perfunctory manner in opening brief are waived); *New York Rehab. Care*

*Mgmt., LLC v. NLRB*, 506 F.3d 1070, 1076 (D.C. Cir. 2007) (same).

Second, the Company likewise "failed to connect Zaremski's retirement" to

the need for such an unprecedented, largescale layoff.  (A. 102-03, 130.)  Zaremski

was immediately replaced by Figarole—a 33-year employee who had served as

Zaremski's assistant for decades and functioned for years as the operations

manager in Zaremski's absence.  (A. 102-03, 130.)  Moreover, the Company was

"well aware" of Zaremski's "possible and then impending retirement" and had

determined "several years" prior to 2019 that Figarole would succeed him.  (A.

130.)  Furthermore, given the Company's execution of its long-settled succession

plan immediately upon Zaremski's departure, its December 20 claim that it

"lack[ed] a supervisor" to run its asphalt-paving operation was "patently false."

(A. 130.)  *See CC1*, 898 F.3d at 32-33 & n.*.

The Company asserts that Figarole's immediate replacement of Zaremski "is of no consequence," pointing to limited testimony of Miceli and employee Terry Holder.  (Br. 49.)  But Miceli's vague claims—for example, that Figarole could not run the asphalt operation "the same" or "as smooth as" Zaremski (A. 524-26)—do not undercut the Board's findings.  And Holder's testimony that asphalt employees typically worked "a little longer" when Figarole filled in as operations manager only undermines the Company's position.  (A. 292-98, 317-18.)  If anything, this testimony suggests that Figarole's ascension would produce *more work*, not drastic layoffs, for the asphalt pavers.

Third, the Company's evidence was "insufficient to substantiate" its claim that implementation of the 7/3 crew size per the Liability Award necessitated its mass layoff for economic reasons.  (A. 103, 130-31.)  The Company asserted that, as a matter of economic imperative, implementing the larger crew size "required" the bundling system of saving up work to assign in clusters, which, in turn, "required" the widespread layoff of unit employees.  (A. 103, 130-31.)  However, the Company "failed to produce evidence corroborating" either point; it proved neither "the financial necessity of [the] bundling [system]" nor that "the implementation of [that] system created financial hardship justifying the layoffs." (A. 103, 130-31.)

43

Indeed, the Company's "sole evidence" in support of such assertions was Miceli's testimony—which was "devoid of specific details" and largely confined to "conclusory" claims.  (A. 130-31; A. 489-95.)  *See W.F. Bolin Co. v. NLRB*, 70 F.3d 863, 873-74 (6th Cir. 1995) (rejecting defense founded on "vague and conclusory testimony").  Moreover, the reliability of Miceli's "sweeping" testimony was undercut by his "incredible" claims that he did not discuss the potential bundling system with Zaremski prior to his retirement.  (A. 122-23, 131.)  Similarly, Miceli's "broad assertions" were further undercut by the Company's "shifting and conflicting [claims] regarding the date that it implemented" the 7/3 crew size.  (A. 129, 131.)[8]

Furthermore, the Company "did not introduce a smidgen of documentary evidence to substantiate Miceli's testimony."  (A. 131.)  *See Prop. Res.*, 863 F.2d at 967-68 (holding manager's testimony insufficient absent "documentation supporting [employer's] alleged financial crunch," noting "lack of documentation for [a] claim of economic necessity is evidence that it does not exist"); *J. Huizinga Cartage Co. v. NLRB*, 941 F.2d 616, 621 (7th Cir. 1991) (employer "failed to

---

[8] As the Board explained (A. 129), the Company variously claimed that it effectuated such implementation on December 20, 2019 (A. 444-45), in late December 2019 (A. 372-73), in early January 2020 (A. 444-45, 530-32, 553-54), in mid-to-late-February 2020 (A. 444-45, 448-503, 799-805, 824-42, 846-76), and in early March 2020 (A. 444-45).  The Company's blinkered suggestion (Br. 46) that it maintained a consistent position concerning the timing of the implementation cannot withstand scrutiny.

44

produce any documentary evidence" substantiating assertion of financial

necessity).  Nor did the Company present any other "independent corroborating

proof" of the alleged "extraordinary conditions in its business" purportedly

necessitating its layoff action.  *Valley Slurry Seal Co.*, 343 NLRB 233, 243, 250

(2004) (quotation marks omitted); *accord A.D. Conner, Inc.*, 357 NLRB 1770,

1784 (2011).  As the Board found, the resulting "evidentiary void" forecloses the

Company's "financial hardship defense."  (A. 103, 131.)

Before the Court, the Company merely repeats its invocation of Miceli's

woefully insufficient testimony.  (Br. 50.)  It therefore presents no basis to disturb

the Board's well-reasoned rejection of its defense.  "To establish [that defense] . . .

[the Company] needed to assemble more than bare assertions or even plausible

reasoning; it had to furnish proof.  This it failed to do."  *Prop. Res.*, 863 F.2d at

967-68.

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDING THAT THE COMPANY VIOLATED SECTION 8(a)(5) AND (1) OF THE ACT BY SUSPENDING ASPHALT-PAVING OPERATIONS AND LAYING OFF ASPHALT-UNIT EMPLOYEES WITHOUT BARGAINING OVER THE EFFECTS

### A. Applicable Principles

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer

to "refuse to bargain collectively with the representatives of [its] employees."  29

U.S.C. § 158(a)(5).[9]  Further, Section 8(d) requires that collective bargaining

encompass negotiations over "terms and conditions of employment."  29 U.S.C. §

158(d).  Even if an employer has no obligation to bargain over a particular

decision, it violates Section 8(a)(5) when it fails to give a union notice and an

opportunity to bargain about that decision's effects on unit employees' interests.

*First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 676-77 & n.15, 681-82 (1981);

*Vico Prods. Co. v. NLRB*, 333 F.3d 198, 207-08 (D.C. Cir. 2003).  As this Court

has explained, the failure to provide such notice and opportunity to bargain

"denigrate[s] the [u]nion and the viability of the process of collective bargaining

itself, in the eyes of unit employees."  *Vico*, 333 F.3d at 208.

Employee layoffs may constitute an effect, subject to mandatory bargaining,

of a managerial decision.  *First Nat'l*, 452 U.S. at 681 ("matters of job security"

must be included "as part of the 'effects' bargaining mandated" by the Act); *NLRB*

*v. Litton Fin. Printing*, 893 F.2d 1128, 1133-34 (9th Cir. 1990), *cert. granted*, 501

U.S. 190 (1991) (analyzing distinct issue); *Cargill, Inc.*, 294 NLRB 867, 869 &

n.12 (1989); *see also Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 954

(D.C. Cir. 1988) ("unilateral implementation of a decision to lay off [employees]"

violates 8(a)(5)).  So too may "the order of succession" of layoffs and recalls, the

---

[9]  An employer that violates Section 8(a)(5) also derivatively violates Section
8(a)(1).  *NLRB v. Ingredion Inc.*, 930 F.3d 509, 513 (D.C. Cir. 2019).

right to be recalled, and severance pay or other benefits for laid-off employees.

*First Nat'l*, 452 U.S. at 677 & n.15; *accord Contemporary Cars, Inc. v. NLRB*, 814

F.3d 859, 880 (7th Cir. 2016).

The Board has the "primary responsibility of marking out the scope . . . of

the statutory duty to bargain," and "[c]onstruing and applying [that] duty" lies at

the "heart of the Board's function." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 494-

97 (1979) (quotation marks omitted). Accordingly, the Board's determination that

an employer has contravened its bargaining obligation is entitled to "great

deference." *Pub. Serv. Co. v. NLRB*, 843 F.3d 999, 1004 (D.C. Cir. 2016).

### B. The Company Breached Its Statutory Bargaining Obligation

#### 1. The Company had an effects-bargaining obligation, and its inadequate briefing has waived any contrary contention

The Board reasonably found that the Company "was obligated to bargain

[with Local 175] regarding the effects of its decision to shut down its asphalt

paving operations and lay off the asphalt workers." (A. 132-33.) Indeed, there can

be no doubt that this decision substantially affected the asphalt pavers' interests as

employees. "Laying off workers works a dramatic change in their working

conditions (to say the least)." *Lapeer Foundry & Machine, Inc.*, 289 NLRB 952,

954 (1988) (quoting *NLRB v. Advertisers Mfg. Co.*, 823 F.2d 1086, 1090 (7th Cir.

1987)). Thus, under settled precedent, the Company was bound to afford Local

175 notice and an opportunity to bargain over the decision's effects. *See, e.g.*,

47

*Teamsters*, 863 F.2d at 954 (employer required to bargain about layoffs' effects); *Litton*, 893 F.2d at 1133-34 (employer obligated to engage in effects-bargaining over ways to avoid or reduce layoff's scope).

Before the Court, the Company baldly claims (Br. 52-54) that it did not have such a bargaining obligation, relying on a hodgepodge of conclusory assertions concerning its now familiar triad of justifications—a seasonal slowdown compounded by Zaremski's retirement and operational changes needed to implement the 7/3 crew size. The Company, however, does not cite *a single precedent* to support its claim. Further, it fails even to clearly identify the legal theories or principles on which it relies—let alone to adequately explain or apply them to the facts of this case. As this Court has repeatedly instructed: "It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Consol. Edison*, 510 F.3d at 340 (quotation marks omitted); *accord New York Rehab.*, 506 F.3d at 1076. This Court should therefore reject the Company's "bare-bones arguments," which are "unsupported by any citations to legal authority." *United States v. Jones*, 744 F.3d 1362, 1370 n.2 (2014) (quotation marks omitted); *accord Jones v. Bernanke*, 557 F.3d 670, 676-77 (D.C. Cir 2009) (contentions waived where party "neither cites nor discusses any relevant case law to support [them]").

The Company continues its perfunctory and unsupported defense with a passing criticism (Br. 53) of the Board's well-supported finding that the Company could not rely on *First National Maintenance* to avoid a bargaining obligation in part because "there is no indication in the record whatsoever that [the Company] changed the scope or direction of its business." (A. 132, citing *First Nat'l*, 452 U.S. at 677, 679 (employer not required to bargain over core entrepreneurial decisions).) The Company fails to back this criticism with anything more than cursory and vague claims. (Br. 53.) It neither cites nor discusses *First National*, and it ignores *First National*'s clear holding—specifically highlighted by the Board (A. 132-33)—that even nonbargainable entrepreneurial decisions require bargaining over their effects. (See p. 46.) Thus, the Company's conclusory and unsupported assertions fail to undercut the Board's finding that the Company had an obligation to bargain over the effects of the shutdown and layoff.

## 2. The Company failed to give Local 175 notice and an opportunity to bargain

Bargaining over the effects of a decision "must be conducted in a meaningful manner and at a meaningful time." *First Nat'l*, 452 U.S. at 681-82. Thus, a basic element of an employer's effects-bargaining obligation is providing the union notice "sufficiently in advance of actual implementation of [the] decision to allow reasonable scope for bargaining." *Int'l Ladies' Garment Workers Union v. NLRB*, 463 F.2d 907, 919 (D.C. Cir. 1972); *accord Vico*, 333 F.3d at 208.

Notifying the union on "the day of the [decision's] implementation" is "clearly insufficient" to satisfy this duty. *Willamette Tug & Barge Co.*, 300 NLRB 282, 282-283 (1990); *accord Teamsters*, 863 F.2d at 954; *Asher Candy, Inc. v. NLRB*, 258 F. App'x 334, 334 (D.C. Cir. 2007). Moreover, to qualify as legally effective "notice," an employer's communication must constitute "a clear announcement that a firm decision has been made" that "affects the employees' terms and conditions of employment." *Sierra Int'l. Trucks Inc.*, 319 NLRB 948, 950 (1995).

Here, substantial evidence supports the Board's finding that the Company "did not notify Local 175 of the shutdown of its asphalt paving operations and layoff of the asphalt paving workers until December 20, [2019,] the date that the layoffs were effectuated." (A. 133-35, 139.) The Company, at times, has claimed that the shutdown and mass layoff were based on its implementation of the 7/3 crew size per the Liability Award. But the judge, affirmed by the Board, credited Rocco's testimony that the Company "did not announce any intention to implement the Award or suggest that the parties engage in effects bargaining . . . at any . . . time prior to December 20." (A. 134; A. 196-98, 213, 231-233, 253-56, 257.) Indeed, rather than suggesting any plan to *implement* the Liability Award, the Company attempted to *vacate* it in district court—and it pledged to do so again once a remedial award issued, a vow the Company never retracted. (A. 134.)

Furthermore, as the Board also emphasized (A. 124, 134, 139), Farrell ultimately "admitted" at trial that prior to December 20, the Company "never informed Local 175 that the 7/3 crew size or the [Liability] Award would be implemented." (A. 124; A. 462-63.) And Miceli made similar admissions. (A. 535-38.) Thus, the record "unequivocally establishes" (A. 139) that the Company notified the Union of its decision to act only "as it took the action." *Teamsters*, 863 F.2d at 954. Under settled law, it thus presented Local 175 with a "*fait accompli*," precluding meaningful effects bargaining and violating Section 8(a)(5). (A. 132-34, 139.) *See, e.g., Garment Workers*, 463 F.2d at 918-919 ("no genuine bargaining can be conducted where [the] decision has already been made and implemented") (quotation marks omitted); *Willamette*, 300 NLRB at 282-283. ("same day notice" clearly forecloses meaningful bargaining "in derogation of [employer's statutory] obligation").

Despite the overwhelming evidence, the Company insists (Br. 54-55) that it gave Local 175 legally sufficient notice of the shutdown and layoff through Miceli and Farrell's statements at the October 25 arbitration hearing and pre-hearing meeting. However, even if Miceli and Farrell's subsequent admissions at the unfair-labor-practice trial (A. 462-63, 535-38) were not alone enough to refute this claim, the October 25 statements themselves (see pp. 8-10) fall far short of "sufficiently clear" notice. *Garment Workers*, 463 F.2d at 918. Indeed, as the

Board found (A. 133-34), the October 25 comments amount to mere "inchoate and imprecise" assertions.  *Sierra*, 319 NLRB at 950 (quotation marks omitted); *see also Penntech Papers v. NLRB*, 706 F.2d 18, 27 (1st Cir. 1983); *Pan Am. Grain Co.*, 343 NLRB 318, 318, 338 (2004), *enforcement denied in part on other grounds*, 432 F.3d 69 (1st Cir. 2005).

Thus, as the Board explained, neither Miceli nor Farrell stated on October 25 that any "definite decision" had been made to implement the 7/3 crews, to suspend operations, and/or to lay off asphalt-unit employees.  (A. 133-34.)  Instead, they expressed only "general prognostications" or "hypothetical" predictions "to the effect that layoffs . . . *could* ensue *if* the 7/3 crew sizes were implemented."  (A. 133-34 (emphases added).)  (See also pp. 8-10.)  Moreover, Miceli and Farrell did not provide "any specific statement" regarding the timing or scope of such a hypothetical layoff, should one take place.  (A. 133-34.)  Accordingly, the Company's "general statements concerning potential future [layoffs]" were neither definite nor specific enough to give Local 175 notice of its December 20 action. *Pan Am.*, 343 NLRB at 318, 338.

The Company suggests (Br. 55-58) that Local 175 somehow waived its statutory right to bargain over the effects of the shutdown and layoff by failing to request such bargaining between October 25 and December 20.  But as the Board explained, this cannot possibly be so because during that time period, Local 175

had no notice of the intended shutdown and layoff.  (A. 134-35, 138-39.)  The Union learned of these actions only as the Company implemented them on December 20, and such "[n]otice of a *fait accompli* is simply not the sort of timely notice upon which the waiver defense is predicated."  *Garment Workers*, 463 F.2d at 919; *accord NLRB v. Seaport Printing & Ad Specialties, Inc.*, 589 F.3d 812, 816-17 (5th Cir. 2009).

Local 175's lack of notice likewise forecloses the Company's claim (Br. 55-58) that the Union waived its bargaining rights by declining to pursue the once-anticipated December 2019 meeting with Mediator Shriftman.  (A. 134-35, 138-39.)  Moreover, that contemplated mediation "was intended to encompass all of the numerous, and significant, pending issues between the parties," in hopes of reaching a global settlement.  (A. 135, 138-39.)  Because the potential mediation was never meant to be "focused solely on the crew-size grievance and [Liability] Award . . . declining to participate in [it] was not the equivalent of a refusal to engage in effects bargaining or a waiver of Local 175's right to do so."  (A. 135.)[10]

_____

[10] Accordingly, Chaikin's alleged remark, during a February 2020 telephone call with the Company's counsel, that Local 175 made a "strategic decision" to forego the Shriftman mediation, is irrelevant.  (A. 135, 138.)  Additionally, in citing this supposed remark, the Company relies on evidence (Br. 57-58 (citing A. 559-63, 1052)) that the Board excluded from consideration as an "evidentiary sanction" for the Company's "egregious failure" to comply with the General Counsel's subpoena.  (A. 135-38.)  Before the Court, the Company does not even acknowledge, much less challenge, this evidentiary ruling.

Similarly, Chaikin's passing comment in a February 2020 email, referenced by the Company, cannot possibly show that Local 175 "refused to meet [in 2019] to discuss [the Company's] anticipated implementation of the larger crew sizes." (Br. 57-58.)  Before December 20, Local 175 was not aware that the Company intended to implement the 7/3 crews.  And as the Board additionally explained, Chaikin's comment "refers to Local 175's position regarding an overall settlement of the crew-size grievance as of February 2020, and does not constitute some retroactive waiver of the right to receive meaningful notice and engage in effects bargaining regarding the shutdown and layoffs."  (A. 138 n.66.)

Having utterly failed to establish that it gave legally effective notice prior to December 20, 2019, the Company changes tack.  It asserts (Br. 54, 56) that Local 175 nonetheless had adequate notice and opportunity to bargain because the Company did not actually effectuate the mass layoff until January 1, 2020.  The record, however, refutes this assertion.  First, as the Board found, the assertion "is contrary to [the Company's] own December 20 notice to the asphalt workers."  (A. 133 n.60.)  That notice as a whole conveys an *immediate* shutdown and layoff.  For example, its opening sentence presents these actions as enduring "until March 2020 and possibly longer" without mentioning any start date—thereby suggesting that the actions are already underway.  (A. 613.)  Further, the notice expressly ties the shutdown and layoff to the Company's purported lack of an asphalt-paving

54

supervisor resulting from Zaremski's retirement, which, as the notice explicitly states, became effective "as of December 20, 2019." (A. 613.) Moreover, the Company *repeatedly admitted* in its position statement to the Board's regional office that it effectuated the mass layoff on "December 20, 2019." (A825, 830, 839.) (*See also* A. 795) Additionally, while the Company now points (Br. 54) to payroll records to support its assertion to the contrary, those records show, consistent with the Company's admissions and the Board's finding, that 30 of the 50 asphalt pavers did not work in December 2019 after the week ending December 22. (A. 624-30)

In any event, the Board also reasonably found—in the alternative—that even if the Company's factual assertion were correct, the period between December 20 and January 1, "encompassing the Christmas, Hanukkah, and New Year's holidays," would "not permit sufficient bargaining" to obviate the Company's unfair labor practice. (A. 133 n.60.) *See Harley-Davidson Motor Co.*, 366 NLRB No. 121, slip op. at 3 (2018) (8 days' notice insufficient); *Pontiac Osteopathic Hosp.*, 336 NLRB 1021, 1021-1024 (2001) (finding union exercised reasonable diligence in requesting bargaining where events occurred during "the disruption of the holiday season").

In response, the Company cites (Br. 56) certain cases in which the Board or a court have found fewer than 10 days' notice to be sufficient. However, what

55

constitutes adequate notice "depends on all the circumstances of a case." *Fountain Valley Reg'l Hosp.*, 297 NLRB 549, 551 (1990); *accord Cascades Containerboard Packaging*, 370 NLRB No. 76, slip op. at 1 n.1 (2021).  And here, the Company ignores the substantial disruption and logistical obstacles imposed by the concurrence of the end-of-year holiday season.  In light of these considerations, substantial evidence supports the Board's alternative finding (A. 133 n.60) that the period from December 20 to January 1 would not have "afford[ed] a reasonable opportunity for counter arguments or proposals" prior to implementation—a prerequisite to meaningful bargaining.  *Pontiac*, 336 NLRB at 1023 (quotation marks omitted).  "This is the sort of evaluation that Congress committed to the expertise of the Board and that deserves [the Court's] deference."  *NLRB v. Emsing's Supermarket, Inc.*, 872 F.2d 1279, 1287 (7th Cir. 1989).

Finally, the Company appears (Br. 57) to seek absolution for its breach of its collective-bargaining duties in the belated offers to engage in effects bargaining that it expressed to Local 175 beginning in late January 2020—which, by all accounts, was weeks after the Company had implemented its suspension of operations and mass layoff of unit employees and after the Company had been notified of the Union's unfair-labor-practice charge.  As this Court has explained, such "after-the-fact offers to engage in effects bargaining are irrelevant because they cannot undo the damage already done to the [union] and the process of

collective bargaining." *Vico*, 333 F.3d at 208; *accord Porta-King Bldg. Sys. v. NLRB*, 14 F.3d 1258, 1264 (8th Cir. 1994).

## CONCLUSION

The Board respectfully requests that the Court enter a judgment denying the petition for review and enforcing the Board's Order in full.

Respectfully submitted,

/s/ Elizabeth A. Heaney
ELIZABETH A. HEANEY
*Supervisory Attorney*

/s/ Michael R. Hickson
MICHAEL R. HICKSON
*Senior Attorney*
*National Labor Relations Board*
1015 Half Street SE
Washington, DC 20570
(202) 273-1743
(202) 273-2985

JENNIFER A. ABRUZZO
    *General Counsel*

PETER SUNG OHR
    *Deputy General Counsel*

RUTH E. BURDICK
    *Deputy Associate General Counsel*

DAVID HABENSTREIT
    *Assistant General Counsel*

National Labor Relations Board
May 2023

## UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____ )
                                                )
NEW YORK PAVING, INC.                           )    Nos.  22-1266
                                                )          22-1289
        Petitioner/Cross-Respondent             )
                                                )    Board Case No.
        v.                                      )    29–CA–254799
                                                )
NATIONAL LABOR RELATIONS BOARD                  )
                                                )
        Respondent/Cross-Petitioner             )
_____ )

### CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), the Board

certifies that this brief contains 12,942 words of proportionally-spaced,

14-point type, and the word processing system used was Microsoft Word 365.

/s/ Ruth E. Burdick
Ruth E. Burdick
Deputy Associate General Counsel
NATIONAL LABOR RELATIONS BOARD
1015 Half Street, SE
Washington, DC 20570-0001
(202) 273-2960

Dated at Washington, DC
this 15th day of May 2023

# STATUTORY ADDENDUM

# STATUTORY ADDENDUM

# TABLE OF CONTENTS

## National Labor Relations Act, 29 U.S.C. § 151, et seq.

Section 7 .................................................................................................. ii
Section 8(a)(1) .......................................................................................... ii
Section 8(a)(3) .......................................................................................... ii
Section 8(a)(5) .......................................................................................... ii
Section 8(c) .............................................................................................. ii
Section 8(d) .............................................................................................. iii
Section 10(a) ............................................................................................ iii
Section 10(e) ............................................................................................ iii
Section 10(f) ............................................................................................ iv

# THE NATIONAL LABOR RELATIONS ACT

**Section 7 of the Act (29 U.S.C. § 157) provides:**

Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3).

**Section 8(a) of the Act (29 U.S.C. § 158(a)) provides in relevant part:**

It shall be an unfair labor practice for an employer--

    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7;

\* \* \*

    (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

\* \* \*

    (5) to refuse to bargain collectively with the representatives of his employees . . . .

**Section 8(c) of the Act (29 U.S.C. § 158(c)) provides:**

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

**Section 8(d) of the Act (29 U.S.C. § 158(d)) provides in relevant part:**

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession. . .

* * *

**Section 10 of the Act (29 U.S.C. § 160) provides in relevant part:**

(a) The Board is empowered . . . to prevent any person from engaging in any unfair labor practice affecting commerce. . . .

* * *

(e) The Board shall have power to petition any court of appeals of the United States . . . within any circuit . . . wherein the unfair labor practice in question occurred or wherein such person resides or transacts business, for the enforcement of such order . . . and shall file in the court the record in the proceeding . . . . Upon the filing of such petition, the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction of the proceeding and of the question determined therein, and shall have power . . . to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board. No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances. The findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive. . . . Upon the filing of the record with it the jurisdiction of the court shall be exclusive and its judgment and decree shall be final, except that the same shall be subject to review . . . by the Supreme Court of the United States upon writ of certiorari or certification as provided in section 1254 of title 28.

(f) Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such court a written petition praying that the order of the Board be modified or set aside. . . . Upon the filing of such petition, the court shall proceed in the same manner as in the case of an application by the Board under subsection (e) of this section, and shall have the same jurisdiction . . . in like manner to make and enter a decree enforcing, modifying and enforcing as so modified, or setting aside in whole or in part the order of the Board; the findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall in like manner be conclusive.

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____ )
                                                  )
NEW YORK PAVING, INC.                             )    Nos.  22-1266
                                                  )          22-1289
    Petitioner/Cross-Respondent )
                                                  )    Board Case No.
    v.                         )    29–CA–254799
                                                  )
NATIONAL LABOR RELATIONS BOARD                    )
                                                  )
    Respondent/Cross-Petitioner )
_____ )

## CERTIFICATE OF SERVICE

   I hereby certify that on May 15, 2023, I filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for District of Columbia Circuit by using the CM/ECF system.  I certify that the foregoing document was served on all parties or their counsel of record through the appellate CM/ECF system.

         /s/ Ruth E. Burdick
         Ruth E. Burdick
         Deputy Associate General Counsel
         NATIONAL LABOR RELATIONS BOARD
         1015 Half Street, SE
         Washington, DC 20570-0001
         (202) 273-2960

Dated at Washington, DC
this 15th day of May 2023